UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TOYOTA INDUSTRIAL EQUIPMENT MFG., INC., *et al.*, | ) ) |
|     *Plaintiffs*, | ) ) 1:14-cv-1049-JMS-TAB |
| *vs.* | ) ) |
| DAVID K. LAND, | ) |
|     *Defendant*. | ) |

## **ORDER GRANTING PRELIMINARY INJUNCTION**

Presently pending before the Court is Plaintiffs Toyota Industrial Equipment Mfg. Inc., Toyota Material Handling North America, Inc., and The Raymond Corporation's (collectively "Plaintiffs") Motion for Preliminary Injunction. [Filing No. 35.] Plaintiffs presented evidence at the June 25, 2014 hearing on their Motion for Temporary Restraining Order ("TRO"), in the exhibits attached to Plaintiffs' Brief in Support of Motion for Temporary Restraining Order, [Filing No. 9-1 to Filing No. 9-8], at the July 8, 2014 hearing to determine whether to extend the TRO, [Filing No. 45], and in the exhibits attached to Plaintiffs' Brief and Reply Brief in Support of Motion for Preliminary Injunction, [Filing No. 36-1 to Filing No. 36-9; Filing No. 47-1 to Filing No. 47-4].[1] Based on that evidence, the Court now **GRANTS** Plaintiffs' Motion for Preliminary Injunction and finds as follows:

---

[1] The Court informed the parties at the hearing about extending the TRO that it did not anticipate that a hearing on the Plaintiffs' Motion for Preliminary Injunction would be necessary but that if a party disagreed, it should move for a hearing as soon as possible. [Filing No. 39 at 2.] No party moved for a hearing on the pending motion.

## Findings of Fact[2]

1.      Toyota Industrial Equipment Mfg. Inc. ("TIEM") and The Raymond Corporation ("Raymond") are manufacturers of lift trucks.

2.      TIEM manufactures lift trucks at its facility in Columbus, Indiana, and Raymond manufactures lift trucks at its facility in Greene, New York and Muscatine, Iowa.

3.      Toyota Material Handling North America, Inc. ("TMHNA") provides management services to support TIEM and Raymond.

4.      The lift trucks manufactured by TIEM are designed by Toyota Industries Corporation ("TICO"), which grants TIEM the right to use the designs in the manufacture of the lift trucks.

5.      TIEM customizes many of the designs to meet specific customers' needs.

6.      Since 2002, Toyota-brand lift trucks have been the best-selling lift trucks in the United States.

7.      TIEM hired Land as a manager in its design engineering department in June 1998.

8.      In that position, Land was responsible for the development, testing, and design maintenance of lift trucks manufactured by TIEM.

9.      Land was also responsible for providing engineering support to Toyota Material Handling, U.S.A., Inc.'s ("TMHU") national accounts.

10.     In January 2012, Land became TIEM's manager of quality assurance.

11.     In that role, Land was responsible for overall product quality, parts inspection, testing, supplier development, and warranty administration for all products manufactured by TIEM.

---

[2] Any finding of fact should be deemed a conclusion of law to the extent necessary.

12. TIEM promoted Land to senior manager of quality assurance in January 2014.

13. Land continued to exercise the same responsibilities for quality assurance and had additional responsibilities for business planning.

14. To perform his management roles for both design engineering and quality assurance, Land needed access to confidential information and documents belonging to TIEM and its affiliated companies, including TICO, TMHNA, Raymond, and TMHU.

15. TIEM granted Land access to technical drawings, product specifications, product design information, and testing protocols.

16. TIEM also granted Land access to warranty data, information about field campaigns, information about product performance, inspection data, and information about TIEM's suppliers and customers.

17. As a manager, Land also had access to non-public financial reports and projections.

18. Land knew throughout his employment with TIEM that the documents and information TIEM granted him access to were the exclusive property of TIEM or its affiliates. TIEM restricts access to those documents and information to people who require access to perform their job functions.

19. The documents and information are stored on secure, password-protected computer servers, and some documents are marked as confidential.

20. Section 6-2 of TIEM's Code of Conduct, which Land acknowledged receiving, provides that "[t]he Company's confidential information should not be disclosed to anyone outside the Company except with prior written approval under a non-disclosure agreement. . . . If

you leave the Company, you must return all Company property, assets and confidential information." [Filing No. 1-1 at 8-9.]

22. 21. Land entered into a Proprietary Information and Inventions Agreement (the "Agreement") with TIEM on June 15, 1998. [Filing No. 36-4.]

22. In that Agreement, Land acknowledged that his employment with TIEM resulted in a confidential relationship in which he would receive information about the company, the company's suppliers, and the processes, finances, marketing and business plans, and other proprietary information (collectively the "Company Business"). [Filing No. 36-4 at 1.] Pursuant to the Agreement, Land agreed that he "shall not disclose to anyone or use at any time, either during or after [his] employment, any of the Company Business . . . unless [he has] the Company's prior written consent." [Filing No. 36-4 at 1.]

23. Land also assigned to TIEM all inventions, ideas, written works, conceptions, designs, and things that he made or conceived of using or incorporating the Company Business. [Filing No. 36-4 at 1.]

24. The Agreement further provided that upon termination of Land's employment, he would "surrender to the Company all Company property and all records and materials relating to the Company Business in [his] or [his] agents' possession . . . ." [Filing No. 36-4 at 2.]

25. The Agreement expressly acknowledged that "the Company will be irreparably harmed by [Land's] breach of this agreement, and that the Company shall be entitled to seek and obtain injunctive relief . . . to prevent any actual or threatened breach of this agreement by [Land]." [Filing No. 36-4 at 2.]

26. Land resigned his position at TIEM at the end of May 2014.

27. At the time Land resigned, he did not disclose to TIEM where he planned to work after leaving TIEM. [Filing No. 9-7 at 2.]

28. Land continued to have access to confidential information between the time he announced his resignation and his departure from TIEM on June 10, 2014.

29. Only after Land's departure from TIEM did Plaintiffs learn that Land would be working for Linde Material Handling North America Corporation ("Linde")—a direct competitor of TIEM and Raymond. [Filing No. 9-8.] Linde's corporate parent, Kion Group, has publicly announced its goal to overtake Toyota as the world's largest manufacturer of lift trucks by 2020. [Filing No. 9-5.]

30. After Land's departure, TIEM learned that Land had copied numerous documents belonging to TIEM and its affiliated companies to a Google Drive that Land created using his Gmail accounts, david.land66@gmail.com and dland007@gmail.com. [Filing No. 9-6.]

31. Gmail is an online email service that provides users with an email account, online storage, and online office applications. [Filing No. 36-6 at 1.]

32. Google, the hosting company for Gmail, provides Gmail users with 15 Giga Bytes (GB) of free online storage space known as "Google Drive." [Filing No. 36-6 at 2.]

33. Google Drive has a program named "GoogleDriveSync.exe" that can be installed and used to synchronize files from a computer directly and automatically to the online Google Drive account. [Filing No. 36-6 at 2.]

34. When installed on a Windows computer, GoogleDriveSync.exe creates a folder named "Google Drive" in the User's account folder on Windows computers. [Filing No. 36-6 at 2.]

35. The GoogleDriveSync.exe program automatically synchronizes files placed in the Google Drive folder (or other specified folder) on the user's computer with the online Google Drive account, and any other computer that the program is installed on for the specific Gmail account. [Filing No. 36-6 at 2.]

36. This means that any file placed in a Google Drive folder on a work computer is automatically copied to an online Google Drive storage account and, if any other computers are synchronized to that Gmail account, the files will be copied to it as well. [Filing No. 36-6 at 2.]

37. The Gmail account dland007@gmail.com was used on the laptop computer Land used while employed by TIEM. [Filing No. 36-6 at 2.]

38. Folders named "Google Drive" and "GoogleDrive2" existed under the "C:\Users\dland\" folder structure. [Filing No. 36-6 at 2.] The folder GoogleDrive2 contains over 11,000 files and folders in it. [Filing No. 36-6 at 2.]

39. Many of the files in the GoogleDrive2 folder appear to be related to Land's employment at TIEM, including the contents of folders named "New Product Development," and "MyDKL\SC\Keep." [Filing No. 36-6 at 2.]

40. The names of the files contained in the GoogleDrive2 folder indicates the files contain information about customers, financial documents, profitability, processes, executive reports, organizational charts, and "Nomura" reports, as well as some exported emails dealing with orders and shipping reports, among other things. [Filing No. 36-6 at 2.]

41. Of the over 11,000 files and folders present in the GoogleDrive2 folder, 752 were created on May 27, 2014 and 45 were created on May 28, 2014. [Filing No. 36-6 at 2.]

42. The GoogleDriveSync.exe program is not currently installed, and was likely uninstalled from the Land's TIEM-issued computer on or after May 30, 2014. [Filing No. 36-6 at 2.]

43. The files and folders contained in the GoogleDrive2 folder were likely automatically copied to the Google Drive of the dland007@gmail.com account, or whatever Gmail account the folder was synchronized to, and could still be present in the online account. [Filing No. 36-6 at 2.]

44. A significant number of files identified in Land's Google Drive contain critical, confidential information regarding lift trucks manufactured by TIEM. [Filing No. 36-1 at 2; Filing No. 36-7 at 3.]

45. Those documents include product specifications, pricing strategies, design and testing data, warranty data, factory order history, sensitive financial data, and instruction documents from a senior quality advisor. [Filing No. 36-1 at 2; Filing No. 36-7 at 3.]

46. TIEM and its affiliates have invested millions of dollars in developing its products and the disclosure to a competitor of the information Land copied to his Google Drive would cause TIEM significant harm. [Filing No. 36-1 at 3; Filing No. 36-7 at 3.]

47. Land began working at Linde as its director of engineering in June 2014. [Filing No. 36-2 at 1.]

48. On June 23, 2014, Land accessed his Gmail account using a computer located at Linde's office in South Carolina. [Filing No. 44 at 20.]

49. During the first hearing on Plaintiffs' Motion for Temporary Restraining Order, Land confirmed under oath that he "had copied electronic files that [he] should not have." [Filing No. 19 at 10-12.] Land testified that he had "no malicious intent," that he was not

7

directed to copy the files by Linde, that the files had not been copied or transmitted to a secondary location, and that to the best of his knowledge, there were all deleted from his Google Drive before being served with the Complaint in this action. [Filing No. 19 at 11-12.]

50. Subsequent investigation revealed that Land deleted documents from his Google Drive the morning of the TRO hearing on June 25, 2014.

51. After the TRO extension hearing on July 8, 2014, Land provided Plaintiffs' expert with a Western Digital WD 640 GB External Hard Drive that he had attached to his personal computer. [Filing No. 47-1 at 2.]

52. Based on his analysis, Plaintiff's expert identified certain documents that had matching names to files found in the "GoogleDrive2" folder contained on the laptop that Land used. Plaintiff's expert identified 264 files where the words "Toyota" or "TIEM" were present in either the file name or the names of the folders containing those files. [Filing No. 47-1 at 2.]

53. Josh Linnemann, TIEM's Senior Manager of Design and Production Engineering, analyzed the external hard drives and identified various documents containing Plaintiffs' confidential information, including, among others, documents created to explain TIEM's development process, approach to new product development, production history, daily production, and objectives for mid-term planning to meet TIEM's 2016 vision. [Filing No. 47-2 at 3-5.]

54. Mr. Linnemann also found that e-mail messages in Land's Gmail accounts contain Plaintiffs' confidential information, including TIEM's key performance indicators, strategies, pricing and costs, and strategic initiatives. [Filing No. 47-2 at 3.]

55. Plaintiffs have recently discovered that Land's Gmail accounts contain messages reflecting that he utilizes at least four additional e-mail addresses not previously disclosed:

pianoman10510@gmail.com; dland@alumni.rose-hulman.edu; dave.land@lawntrax.com; and a hotmail address. [Filing No. 47-3.] Land's emails also indicate that he uses various online storage services, including Dropbox, Ubuntu, and JustCloud. [Filing No. 47-3 at 2.]

56. Plaintiffs served four interrogatories on Land, asking him to identify: (1) all electronic storage devices in his possession, custody, or control since January 1, 2014; (2) all tablet computers, laptop computers, desktop computers, servers, PDAs, and mobile phones in his possession, custody, or control since January 1, 2014; (3) all communications he had with Linde regarding Toyota; and (4) all communications he had with Trace Staffing Solutions (the company that recruited Land to Linde) regarding Toyota. In response, Land provided the same objection to each interrogatory, invoking the federal and state privilege against self-incrimination. [Filing No. 47-4.]

## Conclusions of Law

57. The Court may issue a preliminary injunction under Federal Rule of Civil Procedure 65.

58. "A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895-96 (7th Cir. 2001). "If the court is satisfied that these three conditions have been met, then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Id.* "Finally, the court must consider the public interest (non-parties) in denying or granting the injunction." *Id.*

59. The Court evaluates the balance on a sliding scale so that "the more likely it is the plaintiff will succeed on the merits, the less balance of irreparable harm need weigh towards its side." *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013). "[I]f the plaintiff has a strong likelihood of prevailing in the full trial, and the costs to him if the preliminary injunction is denied are at least as great as the costs to the defendant if it is granted, and the plaintiff's costs could not be fully recouped by him in a final judgment in his favor, the injunction should be issued." *Id.*

60. Plaintiffs assert a claim for Misappropriation of Trade Secrets under the Indiana Uniform Trade Secrets Act (the "Act"). [Filing No. 1 at 11-12.] The Act defines "trade secret" as "information, including a formula pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ind. Code § 24-2-3-2.

61. The Act defines "misappropriation" in relevant part as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Ind. Code § 24-2-3-2.

62. The Act further provides that "actual or threatened misappropriation may be enjoined" and that "the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." Ind. Code. § 24-2-3-3(a).

63. Plaintiffs also assert a claim for Breach of Contract based on the Proprietary Information and Inventions Agreement that Land signed. [Filing No. 1 at 5; Filing No. 1 at 12;

Filing No. 1-2.] That Agreement is governed by Indiana law. [Filing No. 1-2 at 2.] The elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Rice v. Hulsey*, 829 N.E.2d 87, 89 (Ind. Ct. App. 2005).

64. A forensic examination of the computer Land used while employed by TIEM shows that he copied confidential information and documents, including trade secrets and confidential information, onto a Google Drive he controls. Many of those documents are marked as confidential and as being the property of one or more of the Plaintiffs, and Plaintiffs took reasonable actions under the circumstances to maintain their secrecy.

65. Land testified at the Court's first TRO hearing that he "copied electronic files that [he] should not have." This confirms that he knew that the trade secrets were acquired by improper means. Ind. Code § 24-2-3-2.

66. Forensic examination of Land's WD 640 GB External Hard Drive since the Court's July 8, 2014 TRO extension hearing confirms that Land transferred files from his Google Drive account to the external hard drive containing Plaintiffs' confidential information and trade secrets. Forensic examination of Land's email also confirms that it contains attachments with Plaintiffs' confidential information and trade secrets.

67. In response to Plaintiffs' Motion, Land argues that there is no evidence that he has transmitted Plaintiffs' trade secrets to any third party. [Filing No. 46 at 2.] He further contends that his transmission to a Google or other drive was not prohibited by Toyota's policies or procedures. [Filing No. 46 at 3.] The Court rejects these arguments because the Agreement that Land signed expressly provides that upon his termination he "will surrender to the Company all Company property and all records and materials relating to the Company Business in my own or my agents' possession." [Filing No. 9-4 at 2.] The evidence Plaintiffs have submitted, as well as

11

Land's own admissions, establish that at the very least, he did not comply with that provision of the Agreement upon his termination.

68. Based on the evidence in the record, the Court concludes that Plaintiffs are likely to succeed on the merits of at least their Misappropriation of Trade Secrets and Breach of Contract claims.

60. Turning to the second and third factors for obtaining a preliminary injunction, the Court concludes that Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law if the requested injunction does not issue. Specifically, an ongoing threat of potential or actual misappropriation continues, given that the Court cannot conclude that Land no longer possesses or has access to Plaintiffs' confidential information and trade secrets.

61. Since the Court's TRO extension hearing on July 8, 2014, Plaintiffs have discovered that Land has at least four additional email addresses and three online storage services that he did not previously disclose. [Filing No. 47-3.] Plaintiffs have also served interrogatories on Land, asking him to identify the electronic storage devices in his possession, custody, or control since January 1, 2014. In response, Land has asserted his federal and state privilege against self-incrimination. As it is entitled to do, the Court draws an adverse inference from Land's refusal to answer. *See In re High Fructose Corn Syrup Antitrust Litigation, 295 F.3d 651, 663 (7th Cir. 2002)*.

62. Moreover, Land's Agreement with Plaintiffs expressly acknowledged that "the Company will be irreparably harmed by [Land's] breach of this agreement, and that the Company shall be entitled to seek and obtain injunctive relief . . . to prevent any actual or threatened breach of this agreement by [Land]." [Filing No. 36-4 at 2.]

63. For these reasons, the Court concludes that without the requested injunction, Plaintiffs will suffer irreparable harm for which there is no remedy at law. Despite Land's representations that he "has been entirely cooperative with Plaintiffs," [Filing No. 46 at 2], the Court cannot conclude that he no longer possesses or in any way has access to Plaintiffs' confidential documents and trade secrets. If those documents are acquired by a competitor, Plaintiffs will face the irreparable harm of being placed at an unfair competitive disadvantage for which monetary damages will be very difficult to quantify. Until the Court is satisfied that Land no longer possesses or has access to the documents at issue, Land's actual or threatened misappropriation of Plaintiffs' trade secrets causes irreparable harm to Plaintiffs for which there is no adequate remedy at law.

64. Based on the foregoing, the Court has concluded that Plaintiffs have established the first three conditions for obtaining a preliminary injunction. The Court must now consider any irreparable harm that Land will suffer if the injunction is granted and balance that harm against the irreparable harm that the Plaintiffs will suffer if the injunction is denied.

65. Land does not argue that he will suffer irreparable harm if Plaintiffs' requested injunction is granted and he continues to be prohibited from working for Linde. [Filing No. 46.] Even assuming that Land will be harmed, the Court concludes that it is not irreparable harm because Land holds the keys to his release from the injunction. Once the Court is satisfied that Land no longer possesses or has access to Plaintiffs' confidential information and trade secrets, upon the proper showing, the Court will grant Land relief from its injunction prohibiting him from working for Linde. Until that time, however, the Court concludes that the irreparable harm that Plaintiffs will suffer because of actual or threatened misappropriation if the injunction is denied greatly outweighs any harm that Land will suffer by not being able to working for Linde.

66. The Court rejects Land's argument that it cannot prohibit him from working for Linde. [Filing No. 46 at 3-4.] In *Ackerman v. Kimball International, Inc.*, the Indiana Supreme Court rejected an argument that the Act, "which permits a court to enjoin 'actual or threatened misappropriation' of trade secrets, does not permit a court to enjoin the acceptance of employment with a competitor who might benefit from the misappropriation." 652 N.E.2d 507, 510 (Ind. 1995) (quoting Ind. Code § 24-2-3-3(a)). Land attempts to distinguish *Ackerman* because unlike the employee in that case he did not have a non-compete agreement with Plaintiffs, [Filing No. 46 at 3-4], but as the Plaintiffs point out in reply, the Indiana Supreme Court emphasized that it was affirming the trial court's grant of the "*statutory* claim for injunctive relief under Indiana Code § 24-2-3-3," *Ackerman*, 652 N.E.2d at 510 (original emphasis). In doing so, the Indiana Supreme Court confirmed that the Act "grants a trial court broad discretion to fashion injunctive relief 'to eliminate commercial advantage that otherwise would be derived from the misappropriation [of trade secrets].'" *Id.* (quoting Ind. Code § 24-2-3-3(a)); *see also PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995) (affirming district court decision to grant preliminary injunction against employee to prevent him from divulging trade secrets and confidential information in his new job).

67. Here, like the former employee in *Ackerman*, Land engaged in "pre-departure harvesting of [his former employer's] property." 652 N.E.2d at 510-11. Given the significant amount of confidential information and trade secrets to which Land had access, and his failure to convince the Court that he no longer has that access, the Court concludes that this case presents similar circumstances to *Ackerman*. Specifically, given the significant threat of misappropriation and the inadequacy of Plaintiffs' remedy at law should such misappropriation occur, the Court

14

finds it appropriate to enjoin Land from working for Linde at this time.  Ind. Code. § 24-2-3-3(a) (permitting court to enjoin "actual or threatened misappropriation").

68. As for the final factor, because Land does not have a right to possess, use, or disclose Plaintiffs' confidential information or trade secrets, the public will not be harmed as a result of the requested injunction.

69. For these reasons, the Court concludes that the balance of harms significantly weighs in favor of entering Plaintiffs' requested preliminary injunction.  Accordingly, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction.  [Filing No. 35.]  The specific terms of the preliminary injunction will be set forth in a separate order.

**Distribution via ECF only:**

J. Walker Coleman, IV
walker.coleman@klgates.com

Mark R. Waterfill
BENESCH, FRIEDLANDER, COPLAN, & ARONOFF, LLP
mwaterfill@beneschlaw.com

Darren Andrew Craig
FROST BROWN TODD LLC
dcraig@fbtlaw.com

James Dimos
FROST BROWN TODD LLC
jdimos@fbtlaw.com

Michele Lorbieski Anderson
FROST BROWN TODD LLC
mlanderson@fbtlaw.com

Peter G. Rush
K & L GATES LLP
peter.rush@klgates.com

Jennifer H. Thiem
K&L Gates LLP
jennifer.thiem@klgates.com